Norris, Receiver, vs. Persons and others.

*March 13 — March 30, 1880.*

Equity: Appeal: Fraud. *(1) On what grounds a judgment will be reversed in equity. (2) Sale and conveyance held not fraudulent as against creditors.*

1. Where an equity cause was fully tried in the court below, and all the evidence is included in the record on appeal, it is considered here upon the merits, without considering the questions raised upon the rulings as to evidence; and although the finding is merely a general one, that the facts averred in the complaint are true, it will not be disturbed except upon a clear preponderance of evidence against it.

2. In the present case, where the question was, whether a conveyance of lands to the defendant was made in fraud of his grantor's creditors, this court, upon all the evidence (for which see the opinion), holds that the conveyance was not fraudulent, and reverses a judgment against the defendant.

APPEAL from the Circuit Court for *Brown* County.

Action to set aside certain conveyances. On the 28th day of August, 1874, Andrew Reid and his wife conveyed to the defendant *Persons*, by warranty deed, nine lots in the village of West Depere in said county, " with the steam planing-mill

and all other buildings and improvements thereon or to be thereafter constructed, or appertaining thereto," excepting the engine house situated upon one of said lots and belonging to the village of West Depere, " and also the engine, boiler, machinery and machines therein or used in operating said planing-mill." Said conveyance purported to be made in consideration of $12,000 received by the grantors from the grantee. On the 27th of April, 1875, the same grantors conveyed by quit-claim deed to the same grantee the same nine village lots, "with the steam planing-mill and all other buildings and improvements thereon, including the steam engine and boiler, machinery and machines in said planing-mill, and used in operating the same, excepting however the engine house " above mentioned. The sole object of this second conveyance appears to have been to correct an ambiguity in the first.

In July, 1875, one Smith recovered a judgment in said circuit court against Andrew Reid for about $1,600; and during the same month said judgment was docketed and execution issued thereon, which was returned wholly unsatisfied on the 15th of August following. An *alias* execution on the same judgment, issued in July, 1877, was likewise returned wholly unsatisfied. Afterwards, in supplementary proceedings by said Smith against Reid, the plaintiff herein was appointed receiver of the property of said Smith; and soon after he brought this action against *Persons and wife* to set aside, as against himself and said Smith, the deeds above mentioned, on the ground that they were made in fraud of Smith as creditor of Reid. The complaint alleges that the conveyances were made after the contracting of the debts for which Smith's judgment was recovered; and that no part of such pretended consideration of $12,000, nor any other valuable consideration for the conveyances, ever passed between the parties thereto. It contains also other averments usual in such cases.

The answer was; in substance, that the conveyances were made and taken in good faith, for the full consideration mentioned in the first deed, without any intent to hinder, delay or defraud said Smith or any other creditor of Reid.

The court found that all the allegations of the complaint were true, and all averments of the answer, inconsistent therewith, untrue; and it rendered judgment in accordance with the prayer of the complaint; from which defendants appealed.

For the appellants there was a brief by *Hudd & Wigman*, and oral argument by *Mr. Hudd*.

For the respondent there was a brief by *Norris & Ellis*, and oral argument by *Mr. Ellis*.

ORTON, J.  Although the finding of the circuit court is general, sustaining the allegations of the complaint, and'there are no special findings of fact, the case will be considered in this court upon appeal, so far as its merits are concerned, under the rule that this general finding will not be disturbed unless there is a clear preponderance of the evidence against it.  This being a case in equity, after a very full trial, with all the evidence taken and in the record, without passing upon the various questions raised upon matters of practice, and upon the rulings of the circuit court in the admission or rejection of testimony, we think we ought to pass directly upon the merits of the action, under the above rule, as the view we are compelled to take of the evidence must put an end to the case.

In this view we have carefully noticed and considered all of the evidence relating to the main question, whether the sale of the property in controversy by Reid to *Persons*, on the 28th day of August, 1874, was made with the intent to hinder, delay or defraud the creditors of Reid, and therefore void.  On this question the inquiry must be limited to the intent of the parties at the time of and in the transaction of the conveyance, and it is quite immaterial what may have been the intention of either of the parties formed subsequently, and in their deal-

ings with the property, or in their treatment of the creditors of Reid, any further than it may throw light upon the intent with which the sale was made. The evidence bearing upon this question will alone be considered. Before the examination of the evidence relating to what was said and done by the parties at the time of the sale, or to what was said by the appellant *Persons* afterwards, indicating the intent with which the sale was made, we will first consider the situation of the parties and the property, and the circumstances at the time of the sale, which may have an important bearing upon the main question involved.

The testimony relating to the value of the lots conveyed at the time is very conflicting, but we think it was conclusively shown, and by a clear preponderance of the evidence, that, as they were then situated, they were of very little value, except for the purpose of being improved and used for mill and manufacturing purposes, and of much less value than the sum of $12,000, the consideration named in the deed. The mills thereon had been recently burned, and Reid was properly and naturally very anxious to obtain pecuniary assistance from some source for the purpose of rebuilding and again setting in operation his manufacturing business on these lots, in order to make the property productive and useful. He claimed to have other means at the time besides these lots, which he estimated at about $20,000, but not available (except in a very small amount) for such purpose; and he was the owner of several other lots in the village of Depere, but they were of no great value, and he was evidently reputed at the time to be a man of wealth and good credit.

He owed one B. F. Smith at the time about $1,200, on one note of $500, which became due June 20, 1874, and one note of $434, due the last of May, 1874, and one note of $280, due in July, 1874, besides a part of a running account, commencing March 27, 1874, and ending in May, 1875, finally amounting to $216. He, also, at the time, owed one N. C. Foster

$425, due in April, 1874, and part, at least, of a running account, finally amounting to $509. These amounts are named as the principal merely, and rejecting the parts of a dollar, but are sufficiently accurate as affecting the main question. Judgments were entered upon these claims July 14, 1875, and upon supplementary proceedings, after execution returned unsatisfied, the respondent *Norris* (who brings this suit on behalf of these creditors) was appointed a receiver. It does not appear what other creditors, if any, Reid had at the time.

The appellant *Persons* resided and was doing business at Broadhead, a long distance from Depere, and it does not appear that he had any experience in the manufacturing business, or in the building of mills, or in the use of machinery; but he was a man of money capital, and had been formerly engaged in the lumbering business at Depere, and knew something of the property in question. It does not appear that prior to this transaction there had been any intimacy, or special acquaintance, or peculiar friendship between Reid and *Persons*. Reid sought *Persons*, and made application to him, at Broadhead, for pecuniary assistance in rebuilding his mill, and stated to him the situation of the property, and the use he wished to make of the money. It appears from the testimony of Reid that a mortgage to secure the loan was spoken of instead of a deed, and that *Persons* refused to take a mortgage because the creditors of Reid might question it on the ground of fraud; but *Persons* denies that a mortgage was spoken of at all, and the reason given by Reid why *Persons* declined to take a mortgage was a very foolish one, if given, and very improbable.

The better reason than this, for taking a deed upon the conditions and arrangement hereafter referred to, is claimed to have been given by *Persons*, and is made apparent by the nature of the transaction; which was, that *Persons* might retain the control and supervision of the use and investment of his moneys in the improvement of the property, which

property, so improved, would constitute the only adequate security for his advancements. Reid does not claim that he stated to *Persans*, at the time, that he was being pressed by his creditors, or that he was unable to pay his debts; and the fact appears to be that he was not pressed, and that, if pressed at the time, he was able to pay his debts. It appears that the creditor Smith had dealings with Reid while the mill was being rebuilt and set in operation by the use of the moneys of *Persons*, and sold him lumber; and a part of his claims which went into his judgment against Reid, consisted of an account against Reid, which ran several months after this sale was made. And a part of the claims of the creditor Foster appears to be a similar account current against Reid, but between what dates does not appear in the record here returned, but probably running some time after the sale, because his other claim was a note but recently due.

These facts, together with the length of time which elapsed before their entering judgment against Reid, show that neither Smith nor Foster was disposed to press his claim against Reid, but, on the other hand, that they were disposed to treat him with indulgence, until such time as he could realize profits from his restored business by the use of the moneys of *Persons;* and show, also, that neither Smith nor Foster, until a long time after the sale, questioned its *bona fides* or validity.

After this brief statement of the situation of the parties and of the property, as it appears from the evidence, we come to consider the transaction itself; and, in addition to the deed, which was absolute on its face, it becomes necessary to consider the legal effect of the agreement of the parties, and the terms and conditions upon which the money was advanced and the title conveyed.

The substance of this agreement or arrangement is given by several witnesses, and may be best understood by copying the memorandum of it, made by *Persons* at the time of the sale: "A. Reid is to deed me the nine lots where his old

planing mill stood, in West Depere, and finish the new one now in course of construction on said lots, all complete, with pulleys and belting, and engine and boiler, etc., for the machinery for manufacturing sash, doors and blinds, and he is to finish the two dry-houses all ready for drying lumber, for the sum of $12,000; and I am to deed him back one-half of the said nine lots if within five years he pays me $6,000, and half of all the improvements, and half of the first cost of the machinery for making sash, doors and blinds, etc., and half of all the improvements put on said lots, with ten per cent. interest on the same; and the said A. Reid is to take charge of the shop as foreman, and he is to have for his labor one-half of the profits of the business, after paying me ten per cent. interest for all money put into the business, and paying all taxes and insurance, and all expenses of every name and nature."

This memorandum, construed with the agreement as stated by Mr. Baker, who drew the deed, and as stated by Bowen when it was made in his presence at Broadhead, and with the proposition which Reid testifies he made at the time of the first interview with *Persons* (which, in the language of Reid, was, "My proposition to *Persons* was to have him furnish me means to complete the work and take an interest with me; I had the property, but no money; I wished him to furnish money, and he asked me how much the property was worth"), is not difficult to understand. Its legal effect was to make Reid and *Persons copartners* in the property and business, with equal profits, on the condition that Reid should pay back to *Persons* one-half of his advancements and ten per cent. interest. In carrying out this arrangement, Reid had the entire supervision of building the mill and other constructions, putting in the machinery, getting it into operation and stocking it; and *Persons*, without question, furnished the money for these purposes, with the exception of a small amount furnished by Reid out of his own means; and when the mill was finally completed and in operation, Reid acted as the superin-

tendent of the business, until a disagreement took place between the parties, in the fall of 1875.

In June of 1875, the creditor B. F. Smith attached the whole property upon his claims against Reid, on the ground of fraud in the conveyance to *Persons,* and Reid traversed the affidavit in attachment under his *oath,* denying the fraud. After this, nothing appears to have been done by either Smith or Foster to contest the validity of this transaction and enforce their claims against the property for over two years, and until July, 1877, when these supplementary proceedings were instituted. These creditors took no steps to enforce their claims against the property until long after the buildings were completed and the machinery in operation by the use of a very large amount of the moneys of *Persons;* and then took no further steps in that direction for over two years, when the mill was in operation, furnished and supplied by the same means. It looks very much as if these creditors lay by, watching the chances of this enterprise, to see if Reid could not obtain out of it in profits sufficient to pay their demands, and, when they found such a prospect dubious, sought to subordinate the whole property, made valuable by the advancements of *Persons,* to the payment of their claims, on the ground of fraud in the original conveyance.

It is in this condition of affairs, when Reid had abandoned his chances of re-investing himself with one-half of the property, and of obtaining one-half of the profits, and had become personally hostile to *Persons,* that these creditors commence proceedings to set aside this conveyance, and have availed themselves of the testimony of Reid to establish the fraud of the sale. If Reid's evidence had not been rendered entirely worthless by his many contradictions of his own statements, and by now attempting to establish, by his evidence, a fraud, which he had before sworn did not exist, his present attitude of hostility towards *Persons,* and his mistaken interest in having the sale declared void, would, at least, make it very

suspicious and questionable. It appears that *Persons* has advanced in this enterprise, from first to last, a very large sum of money above the first sum named of $12,000; but the evidence is strangely silent as to the present value of the property. It can readily be seen that there is absolutely nothing in the intrinsic nature of this transaction, or in the history of this joint venture of Reid and *Persons*, that should cast even a suspicion of a fraudulent intent upon either Reid or *Persons*. There are no *indicia* or badges of fraud in or about the transaction. It is impossible to find in *Persons* any possible motive to defraud these creditors — even a secondary or incidental motive, much less a principal or paramount one,— in the investment of so large a sum of money for the improvement of the property, which unimproved was of so little value, and in taking his chances of reimbursement from its improved condition and profits. The transaction clothed Reid with a valuable interest in the property and profits of the business, which might have reasonably been considered at the time, and which Reid probably did consider at the time, equal to, if not greater than, the value of the unproductive lots before the transaction took place; and there is nothing in the evidence to show that both Reid and *Persons* did not at the time honestly anticipate that the enterprise would turn out profitable to them both, and result in the ability of Reid to pay all of his debts. And there is nothing in the evidence to show that Reid had not such an interest when he abandoned the business, and that such interest might not at that time have been made available, by these creditors, to the payment of their claims, without disturbing the arrangement of the parties, of which the deed they seek to set aside formed only a part.

The next and only question to be considered is, whether there is any reliable evidence in the case to show that *Persons* expressed an intent to defraud the creditors of Reid at the time of the transaction, or has since admitted or confessed that he had such an intent in taking the conveyance. We

may say here that we are unable to find any satisfactory evidence that Reid himself had any such intent at the time, notwithstanding his admission to that effect since his disagreement with *Persons*. All of the witnesses who testify in relation to any such admissions or expressions of fraudulent intent by *Persons*, except the witness Bowen, are interested in the subject matter and in the event of this suit — Smith and Foster to collect their claims out of the property; Reid to obtain their payment and discharge out of the means furnished by *Persons;* and *Persons* to defend his investment and save his property. Reid testified that *Persons* had himself talked about his creditors, and the effect the transaction would have upon their claims, at the time of the last interview and negotiation at Broadhead. This *Persons* emphatically denies; and the witness Bowen, who was a banker, and evidently a man of good credit at Broadhead, testifies that he was present the whole time of such interview and negotiation, and that nothing whatever was said about Reid having any creditors, and that the subject of the effect of the transaction upon the claims of any of his creditors was not mentioned at all.

This is conclusive of the question that when the contract was made there was no intent to defraud *mentioned* or *considered*. The only witnesses who testify to any pretended admissions of *Persons*, subsequent to the execution of the deed, are these creditors, Smith and Foster; and they were made, according to their own testimony, about the time this litigation was threatened. They both agree that *Persons* told them all about the contract, and its terms and conditions, and the interest which Reid retained in the property and business, substantially as the facts were, as proved, and then admitted that he had consulted a lawyer before the conveyance was made, and that it was made secure and safe against the creditors of Reid. These statements, so far as they relate to the time *before* the conveyance, *Persons* utterly denies, and explains that he did say that he had consulted a lawyer in

Norris, Receiver, vs. Persons and others.

prospect of this litigation, and not before, and that he believed his conveyance was secure and valid, as against the creditors of Reid. This testimony of Smith and Foster, thus emphatically denied by *Persons*, is not sufficiently conclusive to establish fraud in a transaction the result of which would be of such advantage to themselves, unless corroborated by other witnesses who are disinterested, or by facts and circumstances of equivalent force and effect.

But the story of these creditors is in itself incredible. It is not at all likely that *Persons* would confess and admit to these creditors, who were threatening him with this litigation, on the ground of the very fraud which they say he confessed, when no such intent, motive or purpose of the transaction was expressed by either party at the time it was consummated, that the conveyance was actually taken to defraud them, and thus put himself entirely within their power and hazard the very large investment he had made in the property. And it is not at all likely that *Persons*, in the same conversation in which he fully explained to them the terms of the contract, and the interest of Reid in the property and business, confessed to them that all the arrangements between the parties and the operation of the mill jointly and for their mutual profit and advantage, and the investment therein of so large an amount of money capital by *Persons*, and the execution and delivery of an absolute deed, were all but subterfuges only, to cover up the property from the reach of the creditors of Reid. Such a confession by *Persons*, to such persons, at such a time, and under such circumstances, is inconsistent with his mental sanity and common sense.

I have not sought to give the language of the witnesses, but only the substance and effect of their testimony, and that correctly; and from a careful consideration of all the evidence, and of the facts and circumstances, and of the situation of the parties and property at the time of the conveyance, the conclusion is irresistible, that it was made without any intent to

defraud. Therefore, without considering any of the other questions raised upon the appeal, we hold that the respondent entirely failed to prove that the deed of Reid and wife to *Persons* was made with intent to hinder, delay or defraud the creditors of Reid, as alleged in the complaint.

*By the Court.*— The judgment of the circuit court is reversed, with costs, and the cause remanded with directions to that court to dismiss the complaint.